# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2024-KA-01298-COA

CYNTHIA BARNETT                                 APPELLANT

v.

STATE OF MISSISSIPPI                             APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 08/30/2024 |
| TRIAL JUDGE: | HON. DAL WILLIAMSON |
| COURT FROM WHICH APPEALED: | JONES COUNTY CIRCUIT COURT, SECOND JUDICIAL DISTRICT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: AMBER LAUREN STEWART |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: ABBIE EASON KOONCE |
| DISTRICT ATTORNEY: | BRAD RODRICK THOMPSON |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 06/09/2026 |
| MOTION FOR REHEARING FILED: | |

**BEFORE WILSON, P.J., EMFINGER AND LASSITTER ST. PÉ, JJ.**

**LASSITTER ST. PÉ, J., FOR THE COURT:**

¶1.     Cynthia Barnett was indicted on one count of first-degree murder for killing her boyfriend, Earl Myrick. After a trial, the jury convicted Barnett of one count of second-degree murder. Barnett appealed, arguing that the State did not prove that she killed Myrick during an act eminently dangerous to human life and that the State failed to prove she was acting in necessary self-defense. We find no error and affirm.

## FACTS AND PROCEDURAL HISTORY

¶2.     Around 6:15 a.m. in July 2023, Virgil Culpepper arrived at Myrick's trailer in Laurel to pick Myrick up for work. Culpepper honked, but Myrick did not come outside. Culpepper

walked toward the trailer and found Myrick on the ground in front of the steps. Culpepper started to wake Myrick but then realized he was dead. Culpepper called law enforcement.

¶3.    Police determined that Myrick had been shot. A later autopsy revealed three gunshot wounds. Friends and neighbors at the scene told Lead Investigator Troy Lewis that Myrick had been "having issues" with his girlfriend, Barnett. Investigator Lewis went to Barnett's mother's house, where she had been staying. As Investigator Lewis approached the house, he saw two cars in the driveway, one black and one red. He noticed a shell casing on the front dashboard of the black car, which he later determined was Barnett's car.

¶4.    After securing a search warrant, law enforcement found a gun in the red car, which belonged to Barnett's mother. Investigator Lewis testified that the gun was loaded with ammunition that had a "very unique red ring around the primer," and that the shell casing found in Barnett's car had the same "unique" marking.

¶5.    Investigator Lewis brought Barnett to the sheriff's department for questioning. Barnett waived her *Miranda*[1] rights and gave a recorded statement, which was played for the jury. In her interview, Barnett initially claimed that she did not know what happened to Myrick. She told investigators that Myrick had tried to kill her many times and that he was involved with "The Cartel." She said she had been involved with him for a few years and had not left him because she was afraid he would kill her and her family.

¶6.    Barnett told investigators that she and Preston Craney, who lived with her, went to

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

Myrick's trailer to get some of her things that she had left there. She was not sure what time it was, but she said there was some daylight. Barnett claimed that she and Craney got out of the car and that Craney and Myrick were arguing, but it did not turn physical. She and Craney left and went home, and Barnett said she did not leave the house again that night. She said she left without getting her belongings because they did not mean that much to her.

¶7.     Investigators continued to press Barnett, and she eventually changed her story. Barnett admitted she had been lying but said she was scared because "the Mexican Mafia" was going to kill her and because Myrick had told her he would kill her and cut her up into "little bitty pieces." Barnett then told investigators that she went to Myrick's alone, armed with a gun "for protection." Barnett said she knew Myrick would be angry if she tried to "end it" with him. Barnett said that Myrick was near his motorcycle when she arrived and that he "started charging" toward her and yelling at her. Barnett said she stayed in her car with her window cracked.

¶8.     Barnett claimed that Myrick was beating on the car and reaching through the slightly open window. She said the gun was on the passenger seat, hidden under her purse or some clothes. Barnett said she "freak[ed] out" and shot him. She was not sure how close he was when she shot or how many times she shot. Barnett claimed that Myrick fell briefly but then continued to attack the car. Barnett told investigators that Myrick "always" had a knife with him and that he had it out when he came charging at her. But when investigators told her they had not found a knife, she claimed to have been mistaken.

3

¶9.    Barnett told investigators that when she shot Myrick, it was not dark, and she could see clearly. Investigators told her that they had proof Myrick was at a Dollar General between 9:00 and 10:00 p.m. Barnett remained adamant that it was not dark when she killed Myrick.

¶10.    Barnett denied that she went to Myrick's with the intent to kill him. She said she did not have time to think before she shot him. Barnett said he was coming at her and was going to hurt her.

¶11.    At some point, Barnett told Investigator Lewis that Preston Craney, who lived with her mother, had been with her when she shot Myrick. Investigator Lewis interviewed Craney and determined he was not involved with Myrick's death. Craney testified that he had been in Barnett's car earlier in the day that Myrick was killed, but Craney testified that he was not with her when she shot Myrick.

¶12.    Investigator Lewis testified that after the interview, he reviewed recordings of phone calls Barnett had made in jail. He learned that she had not been with Craney that day, as she claimed in the interview, and that her brother, Stephen Hancock, was with her.

¶13.    Hancock testified in Barnett's defense. Hancock testified that he went with Barnett to Myrick's because she was scared to go alone, and he knew she was "frightened" of Myrick. Hancock claimed that when they drove up to Myrick's trailer, Myrick came out of the house and approached the car. Hancock testified that it looked like Myrick had something in his hand, and he told Barnett, "I'm going to kill you, stupid bitch." As Myrick approached the car, Barnett got the gun and shot Myrick. Hancock testified that Myrick fell and grabbed

4

the top of the car, which appeared like he was reaching inside the car, so Barnett "just started firing." Hancock testified that he did not know Barnett had a gun until she shot it. After Myrick fell, they went back home because they were "in shock."

¶14.    Barnett's mother and daughter both testified that Myrick was physically and emotionally abusive toward Barnett. Barnett's mother testified that she had seen bruises on Barnett, but she admitted she had never reported the abuse. Both women testified that Barnett was scared of Myrick.

¶15.    Barnett testified that she and Myrick had been in an on-again, off-again relationship for about a year and a half before the shooting. Barnett said the relationship turned abusive a few months later. Barnett said that she called the police once about the abuse but then lied to officers when they arrived to investigate. She testified that she tried to leave Myrick a few times but always returned out of fear. Barnett claimed that Myrick told her that he would kill her family if she left.

¶16.    On the morning of the shooting, Barnett went to her mother's house because Myrick had threatened to kill her the night before. Barnett said she returned to Myrick's later that day to get pictures of her grandchildren that she had left behind. She asked Hancock to come with her because she was scared and thought Myrick might not harm her if a man was present. Barnett testified that when she arrived, Myrick came out in "full force" and said, "I'm going to kill you, you stupid bitch."

¶17.    Barnett testified that Myrick was trying to get into the car, so she grabbed the gun and

shot him. Barnett said that Myrick fell briefly but stood again, so she shot him "until the gun wouldn't shoot anymore." Barnett testified that she "feared for [her] life." She said she did not go to his house intending to kill him and that "it just happened."

¶18. Barnett testified that the gun she used belonged to her mother and that she got it out of her mother's car before going to Myrick's. Barnett said that she brought it for "protection" since Myrick had threatened her the night before, but she also testified that she did not think he was going to be home.

¶19. Barnett said she did not call the police because she was scared, and she lied about her brother being there because she did not want him to get in trouble. She admitted that she had lied in her interview but claimed it was because she was scared and embarrassed about her relationship with Myrick.

¶20. On cross-examination, the State asked Barnett about her multiple versions of events. Barnett told law enforcement that the car window was only cracked, but she said during a phone call that the window was open and Myrick was attacking her through the window by grabbing her hair. Barnett also told investigators that the gun was under her purse in the passenger seat (when she initially claimed to have been alone), but she later testified that the gun was actually in the car door. Barnett told investigators that Myrick got off his motorcycle and charged at her, but at trial she testified that he came charging out of the house.

¶21. The jury found Barnett guilty of the lesser-included offense of second-degree murder. Barnett's post-trial motions were denied, and this appeal followed.

## ANALYSIS

### I. Did the State prove that Barnett committed an act eminently dangerous to others?

¶22. Although Barnett was indicted for first-degree murder, the jury found her guilty of the lesser-included offense of second-degree murder. The jury was instructed that to find Barnett guilty of second-degree murder, it had to find that Barnett killed Myrick by shooting him while "in the commission of an act eminently dangerous to others and evincing a depraved heart." *See* Miss. Code Ann. § 97-3-19(b) (Rev. 2020). Barnett argues that the State did not prove that she was committing an act eminently dangerous to others because she was "simply sitting in the driver's seat" of her car.

¶23. When this Court reviews the sufficiency of the evidence,

> the critical inquiry is whether the evidence shows beyond a reasonable doubt that the accused committed the act charged, and that he did so under such circumstances that every element of the offense existed. Under this inquiry, all evidence supporting the guilty verdict is accepted as true, and the State must be given the benefit of all reasonable inferences that can be drawn from the evidence. If any rational trier of fact could have found each and every one of the elements of the crime beyond a reasonable doubt, when viewing the evidence in the light most favorable to the prosecution, the verdict must stand.

*McCool v. State*, 328 So. 3d 173, 182-83 (¶32) (Miss. Ct. App. 2021) (citations omitted).

¶24. As the State points out, "courts have consistently upheld convictions of depraved heart murder where the evidence suggested that the firing of a weapon was intentional, not accidental." *Steele v. State*, 852 So. 2d 78, 81 (¶12) (Miss. Ct. App. 2003). "Intentionally firing an instrument as deadly as most handguns is often found to be in disregard of the life

7

of others, even if there was no intention to kill or even injure." *Id.* at (¶13). Barnett testified that she shot at Myrick until she ran out of bullets and that she drove away after he fell. She did not report the shooting to anyone.

¶25.   Taking the evidence in the light most favorable to the State, we hold that the State presented sufficient evidence that Barnett committed an act eminently dangerous to others: she intentionally and repeatedly shot at Myrick and then left him to die. A reasonable juror could have concluded this action met the elements of second-degree murder.

## II.     Did the State prove that Barnett did not act in self-defense?

¶26.   When a defendant claims self-defense, it is the State's burden to prove that she did not act in necessary self-defense. *McCool*, 328 So. 3d at 184 (¶41). "It is not our duty as the appellate court to second-guess" the jury's verdict as to self-defense; "[r]ather, the question before us is whether sufficient evidence existed such that any rational juror could find that [Barnett] did not act in necessary self-defense." *Id.* at (¶43).

¶27.   Here, the State presented evidence that Barnett went to Myrick's trailer, armed with a gun, and she shot Myrick multiple times from inside her car. Barnett had no marks or injuries, and evidence suggested that Myrick was not standing at the car when he was shot. This evidence was sufficient for a reasonable juror to find that Barnett did not act in necessary self-defense.

¶28.   Additionally, the Supreme Court has noted that "[t]he issue of justifiable self-defense presents a question of the weight and credibility of the evidence rather than sufficiency and

8

is to be decided by the jury." *Swanagan v. State*, 229 So. 3d 698, 703 (¶22) (Miss. 2017). This credibility determination was for the jury, which could—and did—reject her story. Barnett claimed to fear Myrick but went to his home to retrieve items she claimed not to care much about. She did not report the shooting and only spoke to law enforcement when they found her. During her interview, Barnett lied repeatedly. Even after the interview, Barnett's story changed and shifted with time.

¶29. The jury was instructed on first-degree murder, second-degree murder, and justifiable self-defense. After hearing the evidence and deliberating, the jury found Barnett guilty of second-degree murder. We find that the State presented sufficient evidence to support the jury's verdict for second-degree murder.

## CONCLUSION

¶30. The State presented sufficient evidence for a rational juror to conclude beyond a reasonable doubt that Barnett shot and killed Myrick while committing "an act eminently dangerous to others," as well as sufficient evidence for a rational juror to conclude beyond a reasonable doubt that Barnett's actions were not in necessary self-defense.

¶31. Barnett's conviction and sentence are **AFFIRMED**.

**BARNES, C.J., CARLTON AND WILSON, P.JJ., WESTBROOKS, LAWRENCE, McCARTY, EMFINGER AND WEDDLE, JJ., CONCUR. McDONALD, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION.**